J. E. Smucker, Executor of Frank Hefright, deceased, and Ann Esther Cunningham v. The Pennsylvania Railroad Company, Appellant.

*Evidence—Ancient document—Map—Boundaries*

In an action of trespass where the controversy turns upon the boundary of land, a map over sixty years old, found in the files in the proper office at the state capital, and prepared by the commonwealth to fix the location of land appropriated by the state for the purposes of a canal, is admissible in evidence as an ancient document, and it is not necessary that the party offering it should show that it was framed and filed at the exact time the state entered upon the land of which the map purported to be the boundary. Such a map is not a paper between the parties as to boundary, but a signification by the commonwealth of the quantity taken by boundary, leaving open to objection on part of the landowner the amount of compensation only, and this would in no way affect the boundary.

Argued April 20, 1898. Appeal, No. 136, Jan. T., 1898, by defendant, from judgment of Superior Court, March T., 1897, No. 26, reversing judgment of C. P. Huntingdon Co., Sept. T., 1891, No. 43, on verdict for defendant. Before STERRETT, C. J., GREEN, McCOLLUM, DEAN and FELL, JJ. Reversed.

Trespass for alleged illegal occupation of lands.

Tried in the court of common pleas, before BELL, P. J., of the 24th judicial district, specially presiding.

Appeal from the Superior Court.

The facts appear by the report of the case in 6 Pa. Superior Ct. 521, and by the opinion of the Supreme Court, infra.

*Error assigned* was in reversing judgment of the court of common pleas.

*John D. Dorris,* with him *William Dorris,* for appellant.— The map was properly admissible in evidence : Com. v. Alburger, 1 Wharton, 469; Huffman v. McCrea, 56 Pa. 95; Phila. & Reading R. R. v. Obert, 109 Pa. 199.

*W. B. Simpson* and *H. H. Waite,* with them *J. R. Simpson,* for appellees.—The draft was ex parte, was not used in, and did not pertain to, either an amicable or adverse proceeding between the state and the landowners ; it was made after the canal was finished, without the knowledge or consent of the owners, and long subsequent to the settlement with a number of the owners of distinct parts of the locus in quo.

In Commonwealth v. Alburger, 1 Wharton, 469, the map was the original town plot of Philadelphia, recorded in the office of the surveyor general, and printed by him ; and of course it was evidence.

In Huffman v. McCrea, 56 Pa. 95, the draft was made and used by the Holland Land Company, the defendant's predecessor in title ; and when offered by the plaintiff it was admitted as an admission of those under whom the defendant claimed.

In R. R. Co. v. Obert, 109 Pa. 199, the draft, if shown to have been made at the time of the acquisition of the land, would have been received as evidence of location, and nothing more— " showing and defining the railroad as of that time."

In Canal Co. v. Dunkel, 101 Pa. 103, the draft was a part of the award of viewers, assessing damages ; and of course it was admissible as evidence of location. In the present case the Superior Court say that if at the next trial it shall be made to appear " that the taking in the case of any of the lots was in accordance with the draft, or that it served as a basis for fixing the compensation," to that extent it would be evidence.

OPINION BY MR. JUSTICE DEAN, October 17, 1898 :

The controversy is as to a strip of land only a few feet wide

between the main line of the Pennsylvania railroad and the Juniata river, where the railroad runs through the borough of Huntingdon. On November 21, 1787, the commonwealth granted to William Smith a tract of land which had for its southern boundary the river; in 1795, Smith laid out the town of Huntingdon on that part of the land adjoining the river. That his plan, from its description, included all the land to the river, is too plain for discussion; no land was intended to be left unappropriated on the bank, and none was left. In the year 1828, the commonwealth undertook the construction of the Pennsylvania canal and, in adopting its route through Huntingdon, took the ends of eight lots at the river side for the bed, berme bank and towing path of the canal; in 1857, the Pennsylvania railroad purchased the canal from the state, and afterwards conveyed it to the Pennsylvania Canal Company, which last named company reconveyed it to the railroad company in 1889. Unquestionably, this put in the railroad company the entire right of the commonwealth, which, it is settled by numerous decisions, was not a mere right of way, but a fee in the land appropriated. In this case, if the commonwealth, when it located and constructed the canal, took from the southern ends of the eight lots all that belonged to them from the north side of the canal to the river, then defendant, when it constructed, in 1891, a new embankment for its roadbed, was on its own land. What was the extent of the appropriation by the commonwealth for canal purposes in 1828, or the years immediately following? At the trial in the common pleas, that court was of opinion, from the apparent conclusiveness of an old map filed in the department of public works at Harrisburg, that plaintiffs had not made out such case as required the submission of the evidence to the jury, and directed a verdict for defendant. On appeal to the Superior Court, that Court reversed the judgment, holding that there was more than a scintilla of evidence that the state had left a strip of land unappropriated, and that the jury should pass upon it. The controlling question in the case with the Superior Court was, what effect should the map have in determining the title to the land? The able judge of that court who delivered the opinion, concedes in effect that the old map does show an appropriation by the state of all the land between the river and the canal, but, as it shows on its face no

date, and from the admission of defendant it must have been made about the year 1832, two years after the assumed completion of the canal, it was not conclusive in favor of defendant's right; that the state could not frame a paper or draft two years after the event and use it as evidence of the extent of the appropriation.

We think this a departure from the settled law of evidence in this state in reference to such documents. The map was over sixty years old; it was found in the files in the proper office at Harrisburg, in a book entitled "Plan Book No. 23 of Public Works," in the very custody and place it should have been. We do not think that, to give effect to such a map, thus guarded, as evidence, it was necessary that defendant should go further and show that it was framed and filed at the exact time the state entered upon the land of which the map purports to be the boundary. The undisputed evidence is that settlements were made with lot owners in Huntingdon while the work was going on, and for some years afterwards. Just when this work was fully completed does not clearly appear from the evidence. The learned judge assumes as a fact that the map was made in 1832, and that the canal had been completed before that time; but as late as March 21, 1831, the legislature (see P. L. page 195) passed an act directing the canal commissioners to prosecute without delay the work from Huntingdon to Hollidaysburg. Taken altogether the evidence shows that the map was made, either while the work was progressing or about the date of its completion, and was intended to show the boundaries of the state's appropriation at that point. In Commonwealth v. Alburger, 1 Wharton, 469, a copy of a plan of the city of Philadelphia, purporting to have been made in 1683, and on file in the surveyor general's office, was offered to show boundaries, and admitted against objection. This Court said it was undoubtedly evidence, being a copy of an official paper on file in the proper place, and of great antiquity. In Huffman v. McCrea, 56 Pa. 95, tried in 1867, an old draft was offered and admitted in evidence, which the witness who identified it said he had first seen in 1836, and that it then looked old; it was admitted, and this Court held the ruling to be correct, because, on a question of boundary, it was an ancient document.

This, then, was an ancient document, bearing two distinct

characters, one, inter partes, the commonwealth and the lot owners concerning compensation, the other, that of a public document. The learned judge of the Superior Court, in his reasoning, seems to treat it only as the first, for he says, "It will hardly be contended that even the state, notwithstanding its great powers, can make title for itself at the expense of the rights of citizens, by maps or drafts prepared in secret, years after the event to which they relate." We are not prepared to say that viewing the paper as a mere contract between individuals this would not be correct, though there are cases which hold such a document even then admissible. But this, except as to compensation, is not a writing between individuals; it is a public document, showing the boundaries of a great public improvement; the public itself, acting through its representative, the state government, projected the improvement and defined the boundaries of the land it appropriated. In doing this it was confined within no prescribed limits; its right to take was limited only by what it deemed necessary to the purpose; the subject, the landowner, could make no effectual objection to the demand of the sovereign as to the quantity or lines of the land. Hence, it was not a paper between the parties as to boundary, but a signification by the commonwealth of the quantity taken by boundary, leaving only open to objection, on part of the landowner, the amount of compensation, and this would in no way affect the boundary. The state, therefore, in the exercise of its right of eminent domain, could, and was bound to, make title for itself, and by its own map indicate the bounds of the land. This map, having been made about the time of the appropriation, and deposited in the proper place, its authenticity could not thereafter be questioned. Its admissibility is fully as well sustained on the facts as that of the document in Commonwealth v. Alburger, supra, where the map was a mere copy made in London by Thomas Holmes, surveyor for William Penn, and which defines the boundaries of Franklin Square, in Philadelphia. It was admitted, because of its antiquity, and because it was an official paper, found in the proper place. The paper before us is not a copy engraved in London, but the original, made by the commonwealth's officers; although no date is upon the paper itself, its contents and the other evidence show it was made about the time the canal

was completed.    Holmes's map showed what were the boundaries of Franklin Square, set apart by the proprietor for public purposes, this map shows the boundaries of the land taken by the commonwealth for a public improvement, and was, therefore, admissible for that purpose.    Being admitted, it is conclusive in favor of defendant, for it shows no land was left between the river and the canal unappropriated.

The judgment of the Superior Court is reversed, and that of the common pleas affirmed.